1   WO

2

3

4

5

6               IN THE UNITED STATES DISTRICT COURT

7                   FOR THE DISTRICT OF ARIZONA

8

9   April Rebecca Estrella,                    No. CV 14-2577-TUC-BPV

10                  Plaintiff,                  **ORDER**

11  v.

12  Carolyn W. Colvin, Acting Commissioner
    of Social Security,
13
                    Defendant.
14

15          Plaintiff April Rebecca Estrella has filed the instant action pursuant to 42 U.S.C. §

16  405(g) seeking review of the final decision of the Commissioner of Social Security.

17  (Doc. 1).  The Magistrate Judge has jurisdiction over this matter pursuant to the parties'

18  consent.  (Doc. 11).  *See* 28 U.S.C. § 636(c).  Pending before the Court are Plaintiff's

19  Opening Brief (Doc. 14), Defendant's Brief (Doc. 15), and Plaintiff's Reply to

20  Defendant's Brief (Doc. 16).  For the following reasons, the Court remands this matter

21  for further proceedings.

22  **I.    PROCEDURAL HISTORY**

23          On July 20, 2011, Plaintiff protectively filed an application for Social Security

24  Supplemental Income ("SSI"). (Transcript/Administrative Record ("Tr.") 15, 124-33).

25  Plaintiff alleged disability as of December 30, 2000 due to schizoaffective disorder with

26  multiple symptoms and  bipolar disorder.  (Tr. 124, 153).  Plaintiff's application was

27  denied initially and upon reconsideration.  (Tr. 65-68, 72-75). Plaintiff requested a

28  hearing, and a video hearing was held before Administrative Law Judge ("ALJ") Norman

R. Buls on June 26, 2013, with Plaintiff, who was represented by counsel, and her sister-in-law providing testimony.  (Tr. 32-48).  On July 16, 2013, the ALJ issued his decision denying  Plaintiff's application.  (Tr. 15-24). Thereafter, the Appeals Council denied Plaintiff's request for review (Tr. 1-5), making the ALJ's decision the Commissioner's final decision for purposes of judicial review.  Plaintiff then initiated the instant action.

## II.   PLAINTIFF'S BACKGROUND

Plaintiff was born on October 18, 1966, and was 44 years of age as of the date of the ALJ's decision.  (Tr. 23).  Plaintiff completed high school with special education services.  (Tr. 396).  She last worked in 2010 at a furniture store cleaning the showroom floor.  (Tr.  35-36, 154).  This work was provided by an organization that places individuals in sheltered work environments.  (Tr.  46). Before working at the furniture store, Plaintiff worked for the City of Tucson in maintenance operations at the convention center. (Tr. 36). Plaintiff testified that in the past, she worked "odd hours…sometime long, sometime short.  It's always been different."  (Tr. 42).

Plaintiff lives with her father-in-law and her son who was six years of age on the date of the hearing.  (Tr. 33-34).  Prior to living with her father-in-law, Plaintiff lived with her sister-in-law, and prior to that Plaintiff had been homeless.  (Tr. 45).

The record reflects Plaintiff's report that she was raised by her father after her parents divorced when she a small child.  (Tr. 394, 448).  Plaintiff's father sexually abused her when she was between seven and seventeen years of age, when she left home. (*Id.*).  Plaintiff has a history of depressed mood since childhood.  (Tr. 394).

Plaintiff testified that she was unable to work because "I have really bad mood swings and I have a hard time sleeping and I get depressed really easy and scared and I'll go hide."  (Tr. 37).  Plaintiff constantly has thoughts in her head and her mind is constantly going which makes it difficult for her to concentrate.  (Tr. 39).  On her bad days, which occur about a week to a week and one half each month, Plaintiff "get[s] really scared and confused and [doesn't] want to do nothing.  Always think people's talking about me and everything else."  (Tr. 38).   Plaintiff does not like people and

becomes nervous around them. (Tr. 40). She does not have friends, does not go to church, and does not socialize. (Tr. 39). She becomes frustrated with unplanned changes. (Tr. 40). Plaintiff has difficulty handling stress and becomes "scared and nervous…" when she has to make an important decision about her son, so she relies on her sister-in-law and brother-in-law for help. (*Id.*).

Ms. Miller, who is Plaintiff's sister-in-law, testified that Plaintiff requires a lot of structure and Ms. Miller reminds her to take a shower, make doctor's appointments for Plaintiff's son, and Ms. Miller and her father "keep an eye on [Plaintiff's son]." (Tr. 44-45; *see also* Tr. 46 ("[I]t's hard for [Plaintiff] to get up and even tend to her child in the morning and it's really hard and my dad has to pretty much do all that.")). According to Ms. Miller, Plaintiff's father-in-law makes most of the meals. (Tr. 208 (when Plaintiff makes meals, she needs assistance)). Also according to Ms. Miller, Plaintiff "is a good worker but needs a scheduled regime [sic] and direction. She hears voices so she don't deal with customers. Her moods change so often." (Tr. 208). When Plaintiff is nervous, she tends to talk to herself. (Tr. 45). At least three to four times a month, Plaintiff has episodes where she will not talk to anyone or will "just talk to herself." (Tr. 45).

## III.   THE ALJ'S DECISION

### A.   CLAIM EVALUATION

Whether a claimant is disabled is determined pursuant to a five-step sequential process. *See* 20 C.F.R. § 416.920. To establish disability, the claimant must show that: (1) she has not performed substantial gainful activity since the alleged disability onset date ("Step One"); (2) she has a severe impairment(s) ("Step Two"); and (3) her impairment(s) meets or equals the listed impairment(s) ("Step Three"). "If the claimant satisfies these three steps, then the claimant is disabled and entitled to benefits. If the claimant has a severe impairment that does not meet or equal the severity of one of the ailments listed…, the ALJ then proceeds to step four, which requires the ALJ to determine the claimant's residual functioning capacity (RFC)[1]….After developing the

---

[1] "The RFC is defined as 'the most' the claimant can do, despite any limitations."

RFC, the ALJ must determine whether the claimant can perform past relevant work…. If not, then at step five, the government has the burden of showing that the claimant could perform other work existing in significant numbers in the national economy given the claimant's RFC, age, education, and work experience." *Dominguez,* 808 F.3d at 405.

### B.    The ALJ's Findings in Pertinent Part

The ALJ determined that Plaintiff had "the following severe impairments: affective disorders." (Tr. 17). In making his decision, the ALJ also considered the potential impact of Plaintiff's obesity, as evidenced by her weight on the alleged onset date of 257 pounds at five feet, eleven inches tall. (*Id.*). He found that Plaintiff had the RFC "to perform a full range of work at all exertional levels but with the following nonexertional limitations: able to perform simple, repetitive, and unskilled work." (Tr. 19). Based upon a vocational expert's review of the file before the hearing, the ALJ determined that Plaintiff was unable to perform any past relevant work. (Tr. 23). The ALJ relied on the Medical-Vocational Rules ("Grids") as a framework to find that there other are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (*Id.*). Therefore, the ALJ determined that Plaintiff was not disabled under the Social Security Act since July 20, 2011, the date her application was filed. (Tr. 24).

### IV.   DISCUSSION

Plaintiff argues that the ALJ erred by: (1) "failing to give controlling weight to the treating and examining [doctors'] opinions"; (2) improperly discounting Plaintiff's credibility; and (3) improperly relying on the Grids. (Doc. 14, p. 2). Defendant counters that the ALJ's decision was free of error on all matters at issue. Defendant also points out that supplemental security income is payable no earlier than the month following the month in which the application was filed. (Doc. 15, p. 3 n. 1). Defendant asserts, and Plaintiff has not disputed, that the relevant period under review is from July 20, 2011, the date Plaintiff protectively filed her application, through July 16, 2013, the date of the

---

*Dominguez v. Colvin*, 808 F.3d 403, 405 (9th Cir. 2015), *as amended* (Feb. 5, 2016) (citation omitted).

1    ALJ's decision.  (Id. at 3 n. 1; *see also* Doc. 16).

2    **A.    STANDARD**

3    The Court has the "power to enter, upon the pleadings and transcript of the record,

4    a judgment affirming, modifying, or reversing the decision of the Commissioner of Social

5    Security, with or without remanding the cause for a rehearing."  42 U.S.C. §405(g).   The

6    factual findings of the Commissioner shall be conclusive so long as they are based upon

7    substantial evidence and there is no legal error.   42 U.S.C. §§ 405(g), 1383(c)(3);

8    *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). This Court may "set aside the

9    Commissioner's denial of disability insurance benefits when the ALJ's findings are based

10   on legal error or are not supported by substantial evidence in the record as a whole."

11   *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).

12   Substantial evidence is "'more than a mere scintilla[,] but not necessarily a

13   preponderance.'"  *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d

14   871, 873 (9th Cir. 2003)); *see also Tackett*, 180 F.3d at 1098.   Further, substantial

15   evidence is "such relevant evidence as a reasonable mind might accept as adequate to

16   support a conclusion."  *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).  Where "the

17   evidence can support either outcome, the court may not substitute its judgment for that of

18   the ALJ."  *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th

19   Cir. 1992)).   Moreover, the Commissioner, not the court, is charged with the duty to

20   weigh the evidence, resolve material conflicts in the evidence and determine the case

21   accordingly.  *Matney,* 981 F.2d at 1019.  However, "the Commissioner's decision 'cannot

22   be affirmed simply by isolating a specific quantum of supporting evidence.'"   *Tackett,*

23   180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir.1998)).

24   Rather, the "court must 'consider the record as a whole, weighing both evidence that

25   supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (*quoting*

26   *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

27   **B.    DOCTORS' OPINIONS**

28   Plaintiff challenges the ALJ's decision not to give controlling weight to Plaintiff's

- 5 -

treating doctor's opinions.[2]

### 1.   TREATING DOCTOR'S OPINIONS

The record contains treatment notes beginning in late November 2010 from Little Colorado Behavioral Health Clinic and continuing through 2013. Plaintiff was primarily treated by Ellen Morse, CNP, Kim Farmer, MA, LPC, Marcia Eisley, R.N., and Plaintiff's primary care physician Sean Wilson, M.D. In November 2012 Plaintiff first presented to arrange for continuation of medication for schizoaffective disorder and insomnia upon moving to the area from Tucson, Arizona. (Tr. 420). At the time, she was taking Benadryl, trazodone, Geodon, and Lamictal. (*Id.*). Counselor Farmer found Plaintiff presented with an apathetic mood, blunted affect, low self-esteem, below average intelligence, partial judgment and impulse control, and poor insight. (Tr. 419). She diagnosed schizoaffective disorder and assessed a global assessment of functioning ("GAF") score of 61.[3] (Tr. 420-21).

---

[2] Although Plaintiff has captioned her argument as challenging the ALJ's decision because he failed to given controlling weight to "the treating and examining opinions", the substance of Plaintiff's argument is that the ALJ erred when he failed to give controlling weight to her treating doctor's opinion and, instead, gave substantial weight to the examining and nonexamining doctors' opinions. (*See* Doc. 14, pp. 2, 6-11).

[3] With regard to GAF scores, the Ninth Circuit has explained that

> "A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." *Vargas v. Lambert*, 159 F.3d 1161, 1164 n. 2 (9th Cir.1998)….Although GAF scores, standing alone, do not control determinations of whether a person's mental impairments rise to the level of a disability (or interact with physical impairments to create a disability), they may be a useful measurement. We note, however, that GAF scores are typically assessed in controlled, clinical settings that may differ from work environments in important respects. *See, e.g., Titles II & XVI: Capability to Do Other Work–The [M]edical–Vocational Rules As A Framework for Evaluating Solely Nonexertional Impairments,* SSR 85–15, 1983–1991 Soc. Sec. Rep. Serv. 343 (S.S.A 1985) ("The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day.").

*Garrison v. Colvin*, 759 F.3d 995, 1003 n.4 (9th Cir. 2014). A GAF score of 61 reflects "[s]ome mild symptoms (*e.g.* depressed mood and mild insomnia) [or]

At a January 2011 psychiatric evaluation performed by NP Morse, Plaintiff reported that without her medication she experiences "racing thoughts, negative thinking, depress[ion] with crying and isolating behaviors, problems with anger and low self-esteem.  She hears voices without her meds that are denigratory and fearful for her."  (Tr. 394).  Plaintiff told NP Morse that "she is doing well overall as long as she takes her medicines everyday."  (*Id.*).  Plaintiff also stated that she has support from her ex-husband's family.  (*Id.*).  On mental status examination, NP Morse found Plaintiff had a blunted objective affect, circumstantial thought processes, disheveled appearance, soft speech and thought blocking processes.  (Tr. 397-98).  NP Morse further stated:

> April is mildly disheveled and looks older than her stated age.  She has poor dentition and does not smile at all. Her intelligence level seems below average and not sure what her IQ level is at but seems close to DD.  Her insight is fair and her impulse control and judgment are also fair.  She has concrete thinking.  No evidence of any thought disorder at this time as she is taking her antipsychotic medication daily.

(Tr. 398).  In her assessment, NP Morse stated:

> April presents with a combination of very traumatic sexual abusive childhood and marginal intellectual functioning.  She has been getting help for her chaotic thoughts, denigratory internal voices, depressive episodes, childhood anger, and low self esteem for the last 10 years with improved stability and better coping with life stressors.  She relies heavily on family support as well as focusing on her role as a good mom.

(*Id.*).  NP Morse's diagnoses included schizoaffective disorder, nicotine dependence, victim of childhood sexual abuse, rule out limited intellectual functioning, and overweight.  (*Id.*).  She assessed a GAF score of 61.  (Tr. 399)  She continued Plaintiff on "[G]eodon for uncontrolled thoughts, zolpidem for insomnia, diphenhydramine for shakes, and lamotrigine for mood swings."  (*Id.*).

---

> some difficulty in social, occupational, or school functioning…., but generally functioning pretty well, has some meaningful interpersonal relationships."  American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994), p. 32.

In February 2011, Plaintiff looked tired and mildly disheveled.  (Tr. 389).  She complained of racing thoughts, mixed mood, increased irritability, increased appetite, and sadness upon the recent death of her mother-in-law.  (Tr. 387).  She also reported she had been out of Geodon for six days.  (*Id.*).  On mental status examination, she exhibited blunted affect, circumstantial thought processes and thought blocking processes.  (Tr. 388-89).  NP Morse wrote: "There is obvious paucity of thought and speech today.  She is sad about family's recent death….She needs to get back on [G]eodone asap as significant risk of deterioration without the [G]eodon and increased family stress with bereavement."  (Tr. 389).

By March 2011, Plaintiff reported she was doing better overall and having no mood swings, and her mental status examination was normal with NP Morse noting: "More stable mood and stable thoughts now."  (Tr. 382, 384).  Throughout the remainder of 2011, Plaintiff complained of mixed mood, increased appetite and, at times, problems sleeping (Tr. 376 (May 2011) (also complaining of generalized anxiety); Tr. 371 (July 2011); Tr. 366 (September 2011)).  During this same period, Plaintiff reported no significant mood swings or hearing voices while taking her medication and her mental status examinations continued to be normal.

On September 20, 2011, Counselor Farmer completed a Supplemental Questionnaire as to Residual Functional Capacity, which Dr. Wilson signed as well.  (Tr. 478-79).  Counselor Farmer opined that Plaintiff was extremely limited in the ability to understand and remember detailed instructions.  (Tr. 478).  Plaintiff was markedly limited in the abilities to: understand and remember short, simple instructions; make judgments on simple work-related decisions; interact appropriately with supervisors and co-workers; and respond appropriately to work pressures and changes in a routine work setting.  (Tr. 478-79).  Plaintiff was moderately limited in carrying out short, simple instructions and interacting appropriately with the public.  (*Id.*).  Counselor Farmer cited Plaintiff's "mood swings, anger, times of paranoia.  Often nervous and panics.  Diagnosed with schizoaffective disorder.  Increased stress brings out her significant

symptoms.  Has a hard time being around many people.  Poor memory." (Tr. 479).

An October 17, 2011 unsigned Annual Behavioral Health Update and Review Summary from Little Colorado Behavioral Health reflects in pertinent part:

> Client has remained stable since intake.  She does well on her medications. She is able to maintain her home and take care of her child.  She is anxious outside of the home.  She cannot handle stress very effectively.  She has been unable to work.  AIMS were normal, no movements.  No hospitalizations.  No arrests.  No substances.  She functions adequately on medications and case management.  She chooses not to attend counseling or groups.

(Tr. 499 (also stating "[a]ble to get her normal activities done.  Not real social.")).  Her GAF was assessed at 61.  (TR. 500).

In January 2012, Plaintiff continued to report feeling well overall, that her mood was good and she was sleeping well, but she continued to have increased appetite.  (Tr. 443).  Her mental status examination was unremarkable.  (Tr. 443-44).  She was continued on lamotrigine for mood swings, diphenhydramine for worry, Geodon for confused thoughts, and Ambien for insomnia.  (Tr. 444).  However, in April 2012, Plaintiff presented with complaints of mixed mood, anxiety and nervousness while awaiting the outcome of her social security application which was expected in the following two weeks.  (Tr. 481).  She stated that "she has been hearing some voices in her head when she gets upset—voices are not scaring her but makes her more nervous." (*Id.*).  On mental status examination, she exhibited anxious affect, circumstantial thought processes and other findings were normal.  (Tr. 481-82).  NP Morse indicated that Plaintiff was "talkative but seems more anxious than usual with some hesitant speech and some breathholding.  Thoughts are loosely organized but she is easily distracted." (Tr. 482).  NP Morse's assessment included that Plaintiff was "[m]ore anxious with some related voices in her head when upset."  (*Id.*).  Lorezapam was prescribed for severe anxiety attack.  (*Id.*).  By July 2012, Plaintiff reported she was doing well overall, her mood was good overall, and she had only taken two lorazepam in the past two months for severe anxiety.  (Tr. 486).  Her mental status examination was normal.  (Tr. 486-87).

On June 4, 2012, Counselor Farmer completed a Supplemental Questionnaire as to

Residual Functional Capacity, which Dr. Wilson signed as well. (Tr. 476-77). Counselor Farmer opined that Plaintiff was markedly limited in the abilities to understand and remember detailed instructions; understand and remember short, simple instructions; make judgments on simple work-related decisions; interact appropriately with the public, supervisors and co-workers; and respond appropriately to work pressures and changes in a routine work setting. (Tr. 476-77). Plaintiff was moderately limited in carrying out short, simple instructions. (Tr. 476). Counselor Farmer stated that Plaintiff "experiences extreme anxiety around people. She cannot function in crowds. Diagnosis is schizoaffective disorder. She hears voices when she gets stressed. Memory is poor when she is anxious. Very easily stressed if taken out of her simple routine. She requires medications to function at a minimum. Medications can cause serious side effects that impair her." (Tr. 477).

On January 10, 2013, Plaintiff reported to NP Morse that she was doing fairly well but she had started to sleepwalk and wanted to stop taking Ambien. (Tr. 551). Plaintiff also stated that she "spends most of her time at home. She is still too nervous when she is out in public to socialize much but she wants to try more this year." (*Id.*). She also reported generalized anxiety. (*Id.*). On mental status examination, Plaintiff presented with blunted affect, thought blocking processes and otherwise was unremarkable except that she "seems more tired today and is a little more slow mentally for some reason." (Tr. 551-53). NP Morse's assessment included that Plaintiff "continues to function marginally with her mental illness and now is sleep walking from the [A]mbien." (*Id.* at 553). Ambien and Benadryl were discontinued and Plaintiff was prescribed Visatril. (*Id.*).

On January 10, 2013, NP Morse completed a Supplemental Questionnaire as to Residual Functional Capacity, which Dr. Wilson signed as well, indicating that Plaintiff was extremely limited in responding appropriately to work pressures in a usual work setting and in responding appropriately to changes in a routine work setting. (Tr. 503). Plaintiff was markedly limited in understanding and remembering short, simple

instructions; carrying out short, simple instructions; understanding and remembering detailed instructions; and interacting appropriately with supervisors. (Tr. 502-03). She was moderately limited in the ability to make judgments on simple work-related decisions and to interact appropriately with the public and co-workers. (*Id.*). NP Morse explained that Plaintiff experiences "[s]ignificant mood swings and confused thinking. Unable to focus [and] handle normal work [and] social stressors….April has lengthy [history] of mental impairment [and] has isolated from people since childhood. Takes [illegible] high [to] mod[erate] doses of antipsychotic and mood stabilizing meds as well as antidepressant….April needs father in law to be her payee." (Tr. 503).

At a March 21, 2013, appointment with NP Morse, Plaintiff reported she was doing pretty well with current medications and that she was sleeping much better with Visatril as compared to Ambien. (Tr. 546). She denied any significant mood swings or hearing voices "as long as I take my meds." (*Id.*). Plaintiff had lost weight by walking more. (*Id.*). Her mental status examination was normal except for thought blocking processes and the note that "her affect is mildly constricted. Her slowness of mental processing is consistent with her limited intellectual functioning. Pleasant and nice demeanor." (Tr. 546-47). NP Morse's assessment included: "[b]etter sleep and stable moods with current meds." (Tr. 547). She was continued on diphenhydramine, lamotrigine, sertraline, Geodon, and hydroxyzine hydrochloride. (Tr. 545).

### 2.    EXAMINING DR. REYES

On March 30, 2012 Plaintiff presented to Gary Reyes, Ph.D., for a consultative examination. (Tr. 447-56). Plaintiff reported to Dr. Reyes that she last worked as a housekeeper at a furniture store in Tucson, which ended when she moved to the White Mountains. (Tr. 447; *see also* Tr. 36 (identifying place of business as a furniture store)). She also worked for the Tucson Convention Center setting up and tearing down rooms for shows, but she was fired due to untreated mental health symptoms. (Tr. 450). She told Dr. Reyes that she did not have any friends since moving to the White Mountains and she spent time playing games on the computer with her five-year-old son and making

cigarette lighter cases out of telephone wire.  (Tr. 448).  She stated she experiences anxiety which causes her to: have difficulty controlling worry; feel restlessness, irritable, and keyed up; be easily fatigued; have difficulty concentrating and her mind goes blank;, and experience sleep disturbance.  (Tr. 449).  She also feels anxious when she feels someone is angry with her.  (*Id.*). Plaintiff reported that with medication she experienced a depressed mood, loss of interest, overeating, insomnia, psychomotor agitation, fatigue, feelings of worthlessness/guilt, and poor concentration/indecisiveness/difficulty thinking.  (*Id.*).  She reported hearing voices in the past and believing that strangers were talking about her.  (*Id.*).  However, with medication she does not experience auditory hallucinations.  (Tr. 450).  She stated she was able to prepare her own meals, and do light household chores, including yardwork, and leave the house to go shopping at a nearby store.  (*Id.*).  She does not attend church or any organized group activities.  (Tr. 450-51).  She reported "that her disability affects her daily living in that 'if I am not on medication, it affects me a lot.  If I am on medication, I can't work by myself.'"  (Tr. 451).

Dr. Reyes found Plaintiff's mood was euthymic and her affect was appropriate.  (*Id.*).  "Her thought process was simplistic though logical, relevant, coherent, and goal directed.  She maintained a stare throughout most of the appointment.  Her speech was simplistic but logical and coherent with a normal rate, rhythm and prosody.  She had a realistic self concept.  Her judgment and impulse control was good and she appeared to have fair insight."  (*Id.*).  He opined that her cognitive functioning was in the "Low Average range of intelligence.  Attention and short-term memory are Low Average."  (Tr. 452).  He diagnosed schizoaffective disorder, depressive type.  (*Id.*).

With regard to Plaintiff's understanding and memory, Dr. Reyes opined that her "academic history special education (K-12) and presentation that included simplistic logic and speech appears to suggest some limitations in her ability to understand and remember detailed logic.  Her reportedly successful treatment of her schizoaffective symptoms in addition to her work history does not appear to suggest any other limitations in this area."  (Tr. 454).  Based on Plaintiff's presentation, successful treatment, and work

history, Dr. Reyes did not believe that Plaintiff was limited in the areas of sustained concentration and persistence or adapting to change. (*Id.*). With regard to social interaction, Dr. Reyes noted Plaintiff's "prolonged stare"; however, based on Plaintiff's successful treatment and work history, Dr. Reyes found she did not have "any other limitations in this area." (*Id.*).

### 3.    NONEXAMINING DOCTORS

On May 14, 2012, Susan Daugherty, Ph.D., a nonexamining state agency reviewer found Plaintiff suffered from schizoaffective disorder, depressive type. (Tr. 463). She opined that Plaintiff had mild limitations on activities of daily living, moderate limitations with regard to maintaining social functioning and maintaining concentration, persistence and pace, and no episodes of decompensation. (Tr. 471). She opined that Plaintiff "is able to perform work where interpersonal contact is incidental to work performed, *e.g.,* assembly work; complexity of tasks is learned and performed by rote, few variables, little judgment; supervision required is simple, direct and concrete (unskilled)." (Tr. 460). She appeared to primarily rely on Dr. Reye's assessment. (*See id.*).

On October 19, 2012, Sheri Tomak, Psy.D., a nonexamining state agency reviewer on reconsideration commented that Dr. Reyes' assessment "appears to be an underestimate of limitations; some moderate limitations seem warranted." (Tr. 59). She determined that Plaintiff was moderately limited in the ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and to respond appropriately to changes in the work setting. (Tr. 60-61). Dr. Tomak also stated that:

> Available data suggests the [Claimant] is able to carry out simple instructions, follow simple work-like procedures, and make simple work-related decisions. [Claimant] appears to have a fair ability to sustain attention throughout extended periods of time. [Claimant] appears to have a fair ability to perform at a consistent pace and maintain a regular 40 hour

- 13 -

1    work schedule.

2    (Tr. 60).

3    **4.    ANALYSIS**

4    The ALJ gave "little weight" to the disability statements from Little Colorado

5    Behavioral Health and Dr. Wilson dated September 20, 2011, October 17, 2011, June 4,

6    2012, and January 10, 2013.  (Tr. 22).  To support this finding, the ALJ stated that the

7    opinions were not consistent with the evidence of record given that Plaintiff was

8    prescribed "routine and conservative mental health, she was documented as admitting she

9    did well when she was medication compliant, she was documented as being medication

10   complaint, her mental status examinations were generally unremarkable, she had no

11   psychiatric hospitalization, she engaged in social activities as noted above including

12   spending time with family, and she could perform activities of daily living and personal

13   care as noted above." (*Id.*).   In assessing Plaintiff's RFC, the ALJ went on to give

14   "significant weight" to Dr. Reyes and the nonexamining stage agency psychological

15   consultants on initial review and reconsideration, presumably Drs. Daugherty and

16   Tomak.  (*Id.*).

17   It is well-settled that the opinions of treating doctors are entitled to greater weight

18   than the opinions of examining or nonexamining physicians.  *Andrews v. Shalala,* 53

19   F.3d 1035, 1040-1041 (9th Cir. 1995). Generally, more weight is given to the opinion of a

20   treating source than the opinion of a doctor who did not treat the claimant. *See Turner v.*

21   *Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1222 (9th Cir. 2010); *Winans v. Bowen*, 853

22   F.2d 643, 647 (9th Cir. 1987).  Medical opinions and conclusions of treating doctors are

23   accorded special weight because treating doctors are in a unique position to know

24   claimants as individuals, and because the continuity of their dealings with claimants

25   enhances their ability to assess the claimants' problems. *See Embrey v. Bowen*, 849 F.2d

26   418, 421-22 (9th Cir. 1988); *Winans*, 853 F.2d at 647; *see also Bray v. Comm'r of Soc.*

27   *Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) ("A treating physician's opinion is

28   entitled to substantial weight.") (internal quotation marks and citation omitted).

A treating physician's opinion may not be entitled to controlling weight where it is not "well-supported" or inconsistent with other substantial evidence in the record. *Orn v. Astrue,* 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)[4]); *see also* 20 C.F.R. § 416.927(c)(2).  In such a case, the ALJ must consider the factors outlined in the regulations for determining what weight to accord the opinion of the treating physician.[5]  *Id* at 631-32.; *see also* Social Security Ruling 96-2p, 1996 WL 374188, *4 ("Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."). Thus, even if the treating physician's opinion does not meet the test for controlling weight, the treating physician's opinion may still be entitled to the greatest weight and should be adopted.  *Orn*, 495 F.3d at 631.

An ALJ may reject a treating doctor's uncontradicted opinion only after giving "'clear and convincing' reasons supported by substantial evidence in the record." *Reddick*

[4] Title 20 C.F.R. §404.1427(d) has been renumbered as 20 C.F.R. §404.1527(c).

[5] The factors for consideration as to the weight the opinion will be given include the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician; and the "nature and extent of the treatment relationship" between the patient and the treating physician. [20 C.F.R.] § 404.1527(d)(2)(i)-(ii)….Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and "[o]ther factors" such as the degree of understanding a physician has of the Administration's "disability programs and their evidentiary requirements" and the degree of his or her familiarity with other information in the case record. *Id.* § 404.1527(d)(3)-(6).

*Orn*, 495 F.3d at 631.  *See also* 20 C.F.R. §416.927(c).

*v. Chater,* 157 F.3d 715, 725 (9th Cir. 1998) (*quoting Lester v. Chater,* 81 F.3d 821, 830 (9th Cir. 1995)).  "Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record."  *Reddick,* 157 F.3d at 725 (citing *Lester,* 81 F.3d. at 830).  Additionally, "like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Lester,* 81 F.3d at 830-31 (this standard also applies when the ALJ rejects opinions from the examining physician in favor of the nonexamining physician).  The ALJ can satisfy his burden of stating specific and legitimate reasons to reject the controverted opinion of a treating or examining doctor "'by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [his] interpretation thereof, and making findings.'" *Tommasetti,* 533 F.3d at 1041 (quoting *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir. 1989)).

The ALJ accorded significant weight to the opinions from Dr. Reyes and the nonexamining doctors.  (Tr. 22).  The ALJ found these opinions consistent with each other and the record as a whole.  (*Id.*).  Plaintiff argues that the ALJ's decision was erroneous because Dr. Reyes "based much of his opinion on incorrect information regarding Ms. Estrella's work history."  (Doc. 14, p. 10; *see also* Doc. 16 (p. 3 ("Dr. Reyes is basing his opinion on his misbelief that Ms. Estrella worked independently at Sam Levits [furniture store] and worked 35 hours at the Tucson Convention Center.")).  Plaintiff points out that she "has impaired memory and poor insight, distorting her perception of her own work history.  [Dr. Reyes] believed Ms. Estrella worked one year as a housekeeper at Sam Levits and worked five years full time setting up and tearing down rooms at [a] convention center."  (Doc. 14, p. 10 (citing Tr. 450)).  "'With regard to mental disorders, the Commissioner's decision must take into account evidence indicating that the claimant's true functional ability may be substantially less than the claimant asserts or wishes.'"  *Garrison,* 759 F.3d at 1017 n. 22 (quoting *Hutsell v.*

*Massanari*, 259 F.3d 707, 711 (8th Cir. 2001)).

Plaintiff testified that her work at the furniture store was obtained through a company that "always kept an eye on me and they come check on me every two months and make sure I'm doing okay and everything's going good."  (Tr. 35; *see also* Tr. 41).  Plaintiff's sister-in-law elaborated that Plaintiff was placed in the job by an organization that "supervised her….[T]hey always checked on her and, you know, made sure she was okay.  And they would give us a call if something was wrong or she went in to one of her episodes or something."  (Tr. 46).  Plaintiff also testified that when she worked at the convention center setting up tables and the like, "I always had somebody next to me when I did that."  (Tr. 36).  Plaintiff asserts in her brief that her employment at the furniture store was provided through an organization that places disabled individuals in sheltered work environments.  (Doc. 14, p. 10 (citing Tr. 46 and http:www.achieveny.org)).  Plaintiff goes on to point out that between 1995 and 1999, her highest earning year was a total of $7,655.74.  (Doc. 14, pp. 10-11 (citing Tr. 137-38)).  *Cf.* 20 C.F.R. § 416.974 (discussing earnings amounts that could establish substantial gainful activity).

Although Dr. Reyes' report reflects that Plaintiff last worked at the furniture store, significantly, he makes no mention that it was through any type of sheltered work program.  Further, although he noted Plaintiff's statement that  even on medication "I can't work by myself[]"  (Tr. 451), and that she was terminated from her work at the convention center because of her untreated mental health symptoms, he went on to address her abilities by considering "her reportedly successful treatment of her schizoaffective symptoms *in addition to her work history*…."  (Tr. 454). Dr. Reyes' reference to Plaintiff's work history to support his opinion contradicts Defendant's position that Dr. Reyes "made no mention of Plaintiff's work history" as basis of his opinion and/or conclusion.  (Doc. 15, p. 7).

The regulations describe sheltered work as work "done under special conditions[]", including that the claimant received special assistance, required special

equipment, was allowed to work irregular hours or take frequent rest periods, and was permitted to work at a lower standard of productivity or efficiency than other employees. 20 C.F.R. § 416.973(c). *See also* SSR 83-33, 1983 WL 31255, *7 ("Sheltered employment is employment provided for handicapped individuals in a protected environment under an institutional program."). "[A] claimant's ability to perform sheltered work does not necessarily establish an ability to engage in substantial gainful work within the meaning..." of the Social Security Act. *Barker v. Sec'y of Health & Human Servs.,* 882 F.2d 1474, 1479 (9th Cir. 1989) (citing *Thompson v. Schweiker,* 665 F.2d 936, 939 (9th Cir. 1982)). Generally, the issue of sheltered work typically comes into play when considering whether a plaintiff is capable of engaging in substantial gainful employment. *See id.* However, as Plaintiff points out, the ALJ gave substantial weight to Dr. Reyes' opinion which was based, in part, on Plaintiff's work history, without any discussion or mention of whether Plaintiff participated in a sheltered work program and the impact that may have had on reliance on her work history in evaluating her.

Disability hearings are not adversarial. *See Delorme v. Sullivan,* 924 F.2d 841, 849 (9th Cir. 1991). "The ALJ in a social security case has an independent duty to fully and fairly develop the record and to assure that the claimant's interests are considered. This duty extends to the represented as well as to the unrepresented claimant….Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to conduct an appropriate inquiry. The ALJ may discharge this duty in several ways, including: subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record." *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) (internal quotation marks and citations omitted). Moreover, "[a] specific finding of ambiguity or inadequacy of the record is not necessary to trigger this duty to inquire, where the record establishes ambiguity or inadequacy." *McLeod v. Astrue.* 640 F.3d 881, 886 (9th Cir 2010); *see also*

*Garcia v. Comm'r of Soc. Sec.,* 768 F.3d 925, 932 n.10 (9th Cir. 2014) ("We have consistently treated an ALJ's failure to develop the record as reversible legal error."). Given Plaintiff's report of termination from her job at the convention center due to her mental health symptoms, her testimony that she worked odd hours, varying in length, and the testimony that she was placed in her last job by a sheltered work program, the evidence of record suggests that Plaintiff has not successfully worked outside of a sheltered program. The ALJ determined that Plaintiff could not return to her past work which may have been performed under a sheltered worker program. The ALJ relied on Dr. Reyes' opinion, in part, that based upon that past work, Plaintiff could perform other work. The ALJ's reliance on Dr. Reyes' conclusions which were, in turn, based on the apparent assumption that Plaintiff successfully worked in the past outside of a sheltered work program is not supported by the record as it now stands. Because the record here is inadequate, additional development of this issue is required.

   With regard to treating Dr. Wilson's opinion, the record reflects that Plaintiff generally presented as stable on medication and while living with her father-in-law. The record also reflects that Plaintiff heard voices, even while on her medication, when she became anxious.   (Tr. 481).   The Ninth Circuit has emphasized that reports of improvement and well being in the context of mental illness "must also be interpreted with an awareness that improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can function effectively in a workplace." *Garrison*, 759 F.3d at 1017-18. *Cf.* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(E) ("if you have chronic organic, psychotic, and affective disorders, you may commonly have your life structured in such a way as to minimize your stress and reduce your symptoms and signs. In such a case you may be much more impaired for work than your symptoms and signs would indicate."). The treating providers stated, among other things, that Plaintiff was unable to focus and handle normal work and social stressors. Generally, more weight is given to treating sources, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the

claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations…." 20 C.F.R 20 § 416.927(c)(2); *Embrey*, 849 F.2d at 422 ("The subjective judgments of treating physicians are important, and properly play a part in their medical evaluations."). Moreover, as Plaintiff points out, even examining Dr. Tomak found that Plaintiff would be moderately limited in carrying out detailed instructions, maintaining attention and concentration for extended periods, completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods, and responding appropriately to changes in the work setting.  (Doc. 14, p. 11 (citing Tr. 59-61))   Plaintiff's sister-in-law testified that Plaintiff required structure with her medication and caring for her son and herself.  (Tr. 44).  Before Plaintiff came to live with her in-laws, she was homeless.  (Tr. 45).  When something changes for her, "she just stays in her room and she won't talk to anybody….She quiets up and…even though her son needs attention,…she will just stay in her room."  (Tr. 44).

> The Commissioner has recognized that:
>
> Individuals with mental disorders often adopt a highly restricted and/or inflexible lifestyle within which they appear to function well. Good mental health services and care may enable chronic patients to function adequately in the community by lowering psychological pressures, by medication, and by support from services such as outpatient facilities, day-care programs, social work programs and similar assistance.
>
> The reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances. The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day. A person may become panicked and develop palpitations, shortness of breath, or feel faint while riding in an elevator; another may experience terror and begin to hallucinate when approached by a stranger asking a question. Thus, the mentally impaired may have difficulty meeting the requirements of even so-called "low-stress" jobs.
>
> Because response to the demands of work is highly individualized,

- 20 -

the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's condition may make performance of an unskilled job as difficult as an objectively more demanding job. [F]or example, a busboy need only clear dishes from tables. But an individual with a severe mental disorder may find unmanageable the demands of making sure that he removes all the dishes, does not drop them, and gets the table cleared promptly for the waiter or waitress. Similarly, an individual who cannot tolerate being supervised may not be able to work even in the absence of close supervision; the *knowledge* that one's work is being judged and evaluated, even when the supervision is remote or indirect, can be intolerable for some mentally impaired persons. Any impairment-related limitations created by an individual's response to demands of work, however, must be reflected in the RFC assessment.

SSR 85-15, 2015 WL 56857, *6 (emphasis in original).  The ALJ's decision does not reflect that he took into account that the treatment records he relied upon to reject the treating provider opinions occurred during a period when Plaintiff was living in such a way as to have reduced stressors, including the fact that she did not live independently, she did not care for her son without assistance, and she did not socialize. Without such consideration, in the context of this case, the substantial evidence of record as a whole does not support the ALJ's stated reasons for rejecting the treating provider opinions concerning Plaintiff's limitations.

## C. PLAINTIFF'S CREDIBILITY

Plaintiff takes issue with the ALJ's finding that although her impairments could reasonably be expected to cause the symptoms she complained of, her statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible. (Tr. 21).

When assessing a claimant's credibility, the "ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment."   *Orn*, 495 F.3d at 635 (internal quotation marks and citation omitted). However, where, as here, the claimant has produced objective medical evidence of an underlying impairment that could reasonably give rise to some degree of the symptom(s), and there is no affirmative finding of malingering, the ALJ's reasons for rejecting the claimant's symptom testimony

must be clear and convincing, which "'is the most demanding [standard] required in Social Security cases.'" *Garrison,* 759 F.3d at 1014 (quoting *Moore v. Comm'r of Soc. Sec. Admin.,* 278 F.3d 920, 924 (9th Cir. 2002)); *see also   Burrell v. Colvin,* 775 F.3d 1133, 1137 (9th Cir. 2014) (reaffirming that the "clear and convincing" standard applies in such cases). "The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996); *see also Orn*, 495 F.3d at 635 (the ALJ must provide cogent reasons for the disbelief and cite the reasons why the testimony is unpersuasive). In assessing the claimant's credibility, the ALJ may consider ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements about the symptoms or between testimony and conduct, and other testimony from the claimant that appears less than candid; unexplained or inadequately explained failure to seek or follow a prescribed course of treatment; the claimant's daily activities; the claimant's work record; observations of treating and examining physicians and other third parties; precipitating and aggravating factors; and   functional restrictions caused by the symptoms. *Lingenfelter v. Astrue,* 504 F.3d 1028, 1040 (9th Cir. 2007); *Orn,* 495 F.3d 636; *Robbins v. Social Sec. Admin.,* 466 F.3d 880, 884 (9th Cir. 2006); *Smolen*, 80 F.3d at 1284.

The record reflects Plaintiff's statements that she lives with her father-in-law, she gets her son ready for school and feeds and bathes him, and she feeds and bathes her pet dog. (Tr. 34, 190-91; *see also* Tr. 236). She is able to attend to her personal care and she is able to do cleaning and laundry. (Tr. 171, 191). She plays computer games with her young son and watches movies. (Tr. 194). She does not have a driver's license, her father-in-law drives her places she needs to go, and she goes to the store on a regular basis. (Tr. 193, 194, 546). According to the ALJ, Plaintiff "described that she had no problems getting along with family, friends, neighbors, or others." (Tr. 20). The ALJ found statements such as these to be inconsistent with Plaintiff's allegations that "her impairments caused difficulty with taking care of personal needs, losing interest in daily

activities, sleeping, changing moods, losing concentration, abnormal thinking, meeting other people, and working at substantial gainful activity level.  (Tr. 19-20).

However, consistent with her testimony, the treatment records establish that Plaintiff has experienced mood swings and auditory hallucinations when not taking her medication and when she feels anxiety and stressed even when taking medication.  (*See* Tr. 481).   She has also had difficulty sleeping, which required medication changes.  As to Plaintiff's activities, some of which she admitted she must be reminded to do, the record reflects that Plaintiff lives with her father-in-law, and before that she lived with her sister-in-law, and before that she was homeless.  There is no showing that Plaintiff was able to tend to her son or herself while living completely on her own.  The testimony of record is that Plaintiff's in-laws help Plaintiff manage her appointments and care for herself and her son.  The Ninth Circuit has "recognized that disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations." *Reddick,* 157 F.3d at 722.    A plaintiff's activities have bearing on her credibility only if her level of activity were inconsistent with her claimed limitations. *Id.*    Activities involving cooking, cleaning, doing the laundry, reading, watching television, grocery shopping, and sometimes visiting friends have been found to be "consistent with chronic mental disability."  *Hutsell,* 259 F.3d at 709, 713 (where plaintiff was diagnosed with chronic schizophrenia-based disorders, including schizoaffective disorder).    Here, Plaintiff's daily activities were essentially consistent with her statements about the symptoms caused by her mental impairment.  She attended to chores and the needs of herself and her child with significant assistance from her in-laws. Even the ALJ recognized that Plaintiff "admitted she managed her own appointments, calendar, and activities *with help.*"  (Tr. 20) (emphasis added).   Moreover, while Plaintiff may have gotten along with her in-laws with whom she lived, the ALJ cited to no evidence of record to support a conclusion that Plaintiff socialized with others. Instead, Plaintiff consistently reported that she kept to herself and her family.  Examining Dr. Reyes noted that she did not attend church or other organized group activities.  (Tr. 450-51).   A

treatment note also reflected Plaintiff's report that she and her father-in-law may have to move based upon a neighbor's complaints about her son "wear[ing] diapers at night for enuresis." (Tr. 443). Other treatment notes reflected that Plaintiff "is still too nervous when she is out in public to socialize much…" (Tr. 551) and that she was not very social. (Tr. 499).

The Ninth Circuit has recognized that "'[i]ndividuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms. Such individuals may be much more impaired for work than their signs and symptoms would indicate.'" *Garrison,* 759 F.3d at 1017 n. 22 (quoting *Hutsell,* 259 F.3d at 711). The evidence of record concerning Plaintiff's allegations of the limiting effects of her impairments are consistent with this observation.

At bottom, the ALJ's credibility finding is not supported by clear and convincing evidence.

### D.   USE OF THE GRIDS

Plaintiff's case was decided at step five of the sequential analysis.   At step five, the burden shifts to the Commissioner to show that Plaintiff can perform other jobs that exist in the national economy.  There are two ways for the Commissioner to meet [her] burden at step five:  "(a) by the testimony of a vocational expert, or (b) by reference to the Medical–Vocational Guidelines [the Grids] at 20 C.F.R. pt. 404, subpt. P, app. 2." *Tackett,* 180 F.3d at 1099 (citations omitted). Here, the ALJ determined by relying on the Grids that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.  (Tr. 23).  In making this determination, the ALJ stated that Plaintiff's "ability to perform work at all exertional levels has been compromised by non-exertional limitations.  However, these limitations have little or no effect on the occupational base of unskilled work at all exertional levels." (Tr. 23-24).

Plaintiff challenges the ALJ's use of the Grids.  Defendant argues that "Plaintiff fails to substantiate her claim that a limitation to simple, repetitive, unskilled work precludes reliance upon the [Grids]…." (Doc. 15, p. 9).  However, Plaintiff's argument is

that the ALJ's RFC assessment and, in turn, reliance on the Grids constituted error because the ALJ failed to sufficiently account for Plaintiff's non-exertional[6] limitations resulting from impaired memory, concentration, persistence, pace, and ability to deal with changes and usual pressures in  a work setting as identified by Plaintiff's treating providers.   (Doc. 14, p. 12 (citing Tr. 476-79, 502-03)).   The record, including the opinions from Plaintiff's treating doctor, also suggests that Plaintiff may be limited in interacting with others.   Consistent with Plaintiff's position, the Commissioner has recognized:

> Where a person's only impairment is mental, is not of listing severity, but does prevent the person from meeting the mental demands of past relevant work and prevents the transferability of acquired work skills, the final consideration is whether the person can be expected to perform unskilled work. The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

SSR 85-15, 1985 WL 56857, *4 (*Titles II & XVI: Capability to Do Other Work-The Medical-Vocational Rules As A Framework for Evaluating Solely Nonexertional Impairments*).

"At step five a vocational expert's testimony is required when a non-exertional limitation is '[]sufficiently severe[] so as to significantly limit the range of work permitted by the claimant's exertional limitation.'" *Hoopai v. Astrue,* 499 F.3d 1071, 1076 (9th Cir. 2007) (quoting *Burkhart v. Bowen*, 856 F.2d 1335, 1340 (9th Cir.1988)). While Plaintiff in this case has no exertional limitations, her mental impairments may nonetheless be sufficiently severe so as to significantly limit the range of available work.

---

[6] "Nonexertional limitations are non-strength related limitations. These include mental, sensory, postural, manipulative, and environmental limitations." *Cooper v. Sullivan*, 880 F.2d 1152, 1156 n. 7 (9th Cir. 1989) (citations omitted).

1   As discussed below, remand for further proceedings is necessary to properly assess

2   Plaintiff's limitations.  The determination on remand will necessarily determine whether

3   use of the Grids is proper or whether testimony from a vocational expert will be required.

4   ## V.   REMAND FOR FURTHER PROCEEDINGS

5           Plaintiff requests that the Court remand this matter for payment of benefits.  (Doc.

6   14, pp. 13-14).

7           "A district court may 'revers[e] the decision of the Commissioner of Social

8   Security, with or without remanding the cause for a rehearing,' *Treichler v. Comm'r of*

9   *Soc.*[] *Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014) (citing 42 U.S.C. § 405(g))

10  (alteration in original), but 'the proper course, except in rare circumstances, is to remand

11  to the agency for additional investigation or explanation,' *id*. (quoting *Fla. Power &*

12  *Light Co. v. Lorion*, 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985))."

13  *Dominguez,* 808 F.3d at 407.  Remand for an award of benefits is appropriate only where

14  the following three prerequisites are met:

15          (1) the record has been fully developed and further administrative
16          proceedings would serve no useful purpose; (2) the ALJ has failed to
            provide legally sufficient reasons for rejecting evidence, whether claimant
17          testimony or medical opinion; and (3) if the improperly discredited
            evidence were credited as true, the ALJ would be required to find the
18          claimant disabled on remand.[7]

19  *Garrison,* 759 F.3d at 1020 (footnote and citations omitted).  In evaluating whether

20  further administrative proceedings would be useful, the court "consider[s] whether the

21  record as a whole is free from conflicts, ambiguities, or gaps, whether all factual issues

22  have been resolved, and whether the claimant's entitlement to benefits is clear under the

23  applicable legal rules." *Treichler*, 775 F.3d at 1103-04.

24          The Ninth Circuit has been clear that it is an abuse of discretion to remand "for an

25  award of benefits when not all factual issues have been resolved." *Treichler,* 775 F.3d at

26  _____

27          [7] The Ninth Circuit has noted that the third factor "naturally incorporates what we
    have sometimes described as a distinct requirement of the credit-as-true rule, namely that
28  there are no outstanding issues that must be resolved before a determination of disability
    can be made."  *Garrison,* 759 F.3d at 1020 n. 26 (citing *Smolen,* 80 F.3d at 1292).

1101, n.5 (citation omitted).  Moreover, even when all three factors of the test are met, the "district court retains the flexibility to 'remand for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act.'"  *Id.* at 1102 (quoting *Garrison,* 759 F.3d at 1021); *see also Dominguez,* 808 F.3d at 407-08 ("the district court must consider whether…the government has pointed to evidence in the record 'that the ALJ overlooked' and explained 'how that evidence casts into serious doubt' the claimant's claim to be disabled.")(quoting *Burrell,* 775 F.3d at 1141).

As discussed above, further development of the record is necessary to consider whether Plaintiff's past work, which Dr. Reyes relied upon in part in making his assessment, was through a sheltered work program.  If so, than a determination must be made as to the impact of Plaintiff's participation in a sheltered work program on the disability determination. Additionally, the ALJ should consider whether Plaintiff is more impaired than her symptoms and signs reflected in the treatment notes from Little Colorado Behavioral Health Center would indicate in light of the fact that Plaintiff appears to have structured her life in such a way as to reduce her exposure to stressors and, thus, reduce her symptoms. *See e.g. Garrison,* 759 F.3d at 1017-18.

With regard to Plaintiff's statements about the limiting effects of her  impairments, "an ALJ's failure to provide sufficiently specific reasons for rejecting the testimony of a claimant or other witness does not, without more, require the reviewing court to credit the claimant's testimony as true."  *Treichler,* 775 F.3d at 1106 ("a reviewing court is not required to credit claimants' allegations regarding the extent of their impairments as true merely because the ALJ made a legal error in discrediting their testimony.").  "The touchstone for an award of benefits is the existence of a disability, not the agency's legal error. To condition an award of benefits only on the existence of legal error by the ALJ would in many cases make disability benefits…available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)."  *Brown-Hunter v. Colvin,* 806 F.3d 487, 495 (9th Cir. 2015) (internal quotation marks and citations omitted). Thus, "only where 'there are

no outstanding issues that must be resolved before a determination of disability can be made,' do we have discretion to credit a claimant's testimony as true and remand for benefits, and only then where 'it is clear from the record that the ALJ would be required to find [the claimant] disabled' were such evidence credited." *Treichler,* 775 F.3d at 1106. (quoting *Moisa v. Barnhart*, 367 F.3d 882, 887 (9th Cir 2004)).  Here, in light of the fact that the record required further development regarding Plaintiff's past work, which may impact the remainder of the analysis, the Court declines to credit Plaintiff's testimony at this point in the proceeding.  Instead, on remand, if the matter is not resolved by further development concerning Plaintiff's past work and/or reconsideration of the treating provider opinions consistent with this Order, then the ALJ should also reassess Plaintiff's credibility.

On remand, the ALJ may take additional evidence, including calling upon a vocational expert if necessary.

**VI.   CONCLUSION**

For the foregoing reasons, the Court remands this matter for further proceedings consistent with this Order.  Accordingly,

IT IS ORDERED that the Commissioner's decision denying benefits is REVERSED.

IT IS FURTHER ORDERED that this matter is REMANDED to the Commissioner for further proceedings consistent with this Order.

The Clerk of Court is DIRECTED to enter Judgment accordingly and to close its file in this matter.

Dated this 29th day of March, 2016.

Bernardo P. Velasco
United States Magistrate Judge

- 28 -